## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| (1) ROLAND KEITH BATES, as Special Administrator of the Estate of ROLAND, KYLE BATES, Deceased, | ) ) ) ) |  |
|  | ) |  |
| Plaintiff, | ) ) | Case No.: CIV-23-421-J |
| vs. | ) ) |  |
| (1) SHERIFF OF CLEVELAND COUNTY, OKLAHOMA, IN HIS OFFICIAL CAPACITY, (2) TURN KEY HEALTH CLINICS, LLC, (3) RED ROCK BEHAVIORAL HEALTH, (4) MEGAN SHELBY, LPC, (5) DOES ##1-5, (6) SARAH E. NUÑEZ, | ) ) ) ) ) ) ) ) ) | Jury Trial Demanded  Attorney Lien Claimed |
| Defendants. | ) ) |  |

## COMPLAINT

**COMES NOW** the Plaintiff Roland Keith Bates ("Plaintiff"), as the Special Administrator for the Estate of Roland Kyle Bates, deceased ("Kyle" or "Mr. Bates"), and for his Complaint against the above-named Defendants alleges and states as follows:

## PARTIES

1.     Plaintiff, Roland Keith Bates ("Plaintiff"), is a resident of Okfuskee County, Oklahoma, and the duly-appointed Special Administrator of the Estate of Mr. Bates. Plaintiff is also Mr. Bates' father. The survival causes of action in this

1

matter are based on violations of Mr. Bates' rights under the Fourth, Eighth and/or Fourteenth Amendment to the United States Constitution and Oklahoma Law.

2.      Defendant Sheriff of Cleveland County, Oklahoma ("Sheriff") is the Sheriff of Cleveland County, Oklahoma, residing in Cleveland County, Oklahoma and acting under color of state law. The Sheriff is sued purely in his official capacity. It is well-established, as a matter of Tenth Circuit authority, that a § 1983 claim against a county sheriff in his official capacity "is the same as bringing a suit against the county." *Martinez v. Beggs,* 563 F.3d 1082, 1091 (10th Cir. 2009). *See also Porro v. Barnes,* 624 F.3d 1322, 1328 (10th Cir. 2010); *Bame v. Iron Cnty.,* 566 F. App'x 731, 737 (10th Cir. 2014).  Thus, in suing the Sheriff in his official capacity, Plaintiff has brought suit against the County/Cleveland County Sheriff's Office ("CCSO").

3.      Defendant Red Rock Behavioral Health Services ("Red Rock") is a domestic not-for-profit organization that, at all times relevant hereto, regularly conducts business in Cleveland County, OK.

4.      Defendant Turn Key Health Clinics, L.L.C.  ("Turn Key") is an Oklahoma limited liability company doing business in Cleveland County, Oklahoma.  Turn Key is a private correctional health care company that contracts with counties, including, during the pertinent timeframe, Cleveland County, to provide medical professional staffing, supervision and care in county jails. Turn Key was at all times relevant hereto responsible, in part, for providing medical services, supervision and medication to Mr. Bates while he was in the custody of CCSO. Turn Key was additionally responsible, in part, for creating, implementing and

2

maintaining policies, practices and protocols that govern the provision of medical and mental health care to inmates at the Cleveland County Jail, and for training and supervising its employees. Turn Key was, at all times relevant hereto, endowed by Cleveland County with powers or functions governmental in nature, such that Turn Key became an agency or instrumentality of the State and subject to its constitutional limitations. Turn Key is also a recipient of federal funds.

5.     Defendants DOES ##1-5 were, at all times relevant hereto, staff members at the Cleveland County Jail ("Jail") acting under color of state law, and within the scope of their employment, as an employee or agent of CCSO/the County. DOES ##1-5 were responsible, in part, for assuring that the Jail inmates under their care and supervision, like Kyle, were adequately cared for and that their basic safety, medical and mental health care needs were met.

6.     Defendant Megan Shelby, LPC, was, at all times relevant hereto, an employee/agent of Red Rock.

7.     Defendant Sarah E. Nuñez ("Nurse Nuñez") was, at all times relevant hereto, an employee and/or agent of Turn Key/CCSO, who was, in part, responsible for overseeing Kyle's health and well-being; and assuring that Kyle's medical/mental health needs were met, during the time he was in the custody of CCSO. At all times pertinent, Nurse Nuñez was acting within the scope of her employment and under color of state law. Nurse Nuñez is being sued in her individual capacity.

## JURISDICTION AND VENUE

3

8.     The acts giving rise to this lawsuit occurred in Cleveland County, State of Oklahoma, within this judicial district.

9.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of, and to redress deprivations of, rights secured by the Eighth and/or Fourteenth Amendments to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

10.     The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Eighth and/or Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

11.     This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, since the claims form part of the same case or controversy arising under the United States Constitution and federal law.

12.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.

**FACTUAL ALLEGATIONS**

13.     Roland Kyle Bates ("Kyle" or "Mr. Bates") was arrested by the Moore Police Department ("MPD") on or about May 6, 2021.

14.     Immediately after being arrested, Kyle showed obvious signs of suicidal ideation and self-harm. He told the MPD Officers that he was going to kill

4

himself and he repeatedly bashed his head against the window of the MPD vehicle, inflicting a significant head wound.

15.    Upon information and belief, MPD officers transported Kyle to Norman Regional Hospital ("Norman Regional") for evaluation and treatment.

16.    Providers at Norman Regional noted that Kyle was experiencing "SUICIDAL    IDEATION…SELF    INFLICTED    HEAD    WOUND, LAC[ERATION] TO BACK OF HEAD…"

17.    Norman Regional also noted that Kyle "does indicate that he is suicidal due to recent life circumstances."

18.    Norman Regional further stated that the MPD Officer "indicates that the patient will be placed on suicidal precautions and [Jail] will coordinate further care in regards to mental health."

19.    Kyle's head wound was treated at Norman Regional, and he was transported to the Cleveland County Jail ("Jail") where he was booked at approximately 2:00 p.m. on May 6, 2021.

20.    During the booking process, administered by Turn Key Nurse Derek McGuire, LPN, Kyle underwent a medical intake screening. During this process, Kyle reported that he was suicidal and was also detoxing from opioids. Kyle also reported a history of manic depression and borderline schizophrenia and that he had previously attempted suicide.

21.    Despite Kyle's obvious laceration on his head, Nurse McGuire charted that Kyle did not have any "injuries to report due to arrest or booking."

22.     Nurse McGuire noted that Kyle appeared "anxious", "disheveled", "insensible", "lethargic", and had an "unstable gait" and "trauma markings."

23.     Despite Kyle's reports about his mental health history, suicidal ideation, previous suicide attempts, and recent self-harm, Nurse McGuire recommended that Kyle be placed in general population, without any suicide precautions.

24.     At approximately 3:00 p.m. on May 6, Kyle complained of chest pain. A Turn Key Nurse, believed to be Derek McGuire, LPN, saw Kyle, who reported chest pain and anxiety. Kyle's blood pressure (156/104) and pulse (103) were high. Kyle was given no treatment for his complaints.

25.     On May 7, 2021, a Cleveland County District Judge filed a "Summary Order" regarding Kyle. The Summary Order states:

> The above styled matter comes now on information that the above identified ***respondent appears to be suffering from a mental illness and should be evaluated to determine if such mental illness exists and whether involuntary inpatient treatment is the least restrictive alternative form of treatment***.
>
> Based on the information and/or statements provided to this Court and for good cause shown, ***Cleveland County Sheriff's Office is hereby directed to take the Respondent into protective custody and transport the Respondent to Red Rock Behavioral Center on a conditional PR bond for evaluation/treatment.*** Cleveland County Sheriff's Office to be notified prior to the release of Respondent and returned to the custody of CCSO immediately upon release.
>
> (emphasis added).

6

26.     Nevertheless, the County and Turn Key did little, if anything, to help Kyle.  On the contrary, as demonstrated by this case, through their acts and omissions, the County/CCSO and Turn Key exacerbated and aggravated the already excessive risks and dangers of suicide.

27.     Indeed, Kyle was not transported to Red Rock until May 12, 2021, five days after the judge's order.

28.     In the meantime, Kyle was subjected to abhorrent treatment at the Jail, in deliberate indifference to his obviously serious medical and mental health needs.

29.     On May 7, 2021, Kyle was "tazed" by an unknown Jail employee. He was given basic first aid for his wounds by a Turn Key nurse.

30.     On or about May 8, 2021, at approximately 12:50 p.m., CCSO officers at the Jail reported to Turn Key Nurse Natasha Kariuki that Kyle was "trying to hang himself with his smock. Patient was moved to B130 w[h]ere he started hitting head on windows. Patient placed in wrap."

31.     Nurse Kariuki noted that Kyle stated several times that he "wanted to die and not be here anymore."

32.     Kyle was subsequently placed on suicide watch in a segregation cell.

33.     On information and belief, Kyle was left in the Wrap, a full-body restraint device, for several hours on May 8, in violation of the manufacturer's guidelines. Upon information and belief, Jail employees, including Defendants DOES ##1-5, did not adequately check on Kyle while he was in the Wrap.

34.     At 2:45 p.m. on May 8, Nurse Kariuki conducted a "welfare check for patient to continue restraints." There is no note indicating that Kyle was taken out of restraints at that time.

35.     The very next day, May 9, however, Turn Key Nurse Kevin Burkart recommended that Kyle be taken off of suicide watch.

36.     Upon information and belief, Kyle attempted suicide again on May 10, 2021.

37.     Upon information and belief, he was placed back on suicide watch at approximately 6:37 a.m. and *again* placed in the Wrap, where he remained until approximately 11:00 a.m., in violation of the manufacturer's guidelines.

38.     Despite being put on suicide watch, Kyle was not adequately supervised or checked on by the Turn Key and CCSO employees responsible for his care, including Defendants DOES ##1-5 and Nurse Nuñez.

39.     Upon information and belief, Kyle once again attempted suicide/self-harmed at approximately 10:30 a.m. on May 12, 2021. A Turn Key nurse noted that she performed wound care to lacerations on Kyle's left arm.

40.     At approximately 12:30 p.m. on May 12 – after Kyle had attempted suicide no fewer than three times in his week at the Jail – Kyle was transported to Red Rock for an evaluation.

41.     At Red Rock, Kyle was "evaluated" by Licensed Professional Counselor ("LPC") Megan Shelby. Kyle told Shelby that the Jail was not meeting

his basic needs, had placed him in solitary confinement, and thought he was "faking it."

42.     Despite Kyle's additional reporting about his mental health history, detox, self-harm, and suicidal ideation, Shelby determined that Kyle "didn't meet inpatient criteria or need for mental health treatment at our facility…" When Shelby told Kyle about her determination, he "got visibly very upset" and told her that he would try to hurt himself once he got back to the Jail. Kyle told Shelby, "I will be suicidal if I have to go back there."

43.     Shelby noted that she contacted the Cleveland County Court and the County Sheriff after "assessing" Kyle, and discharged him back into CCSO's custody.

44.     Kyle was transported back to the Jail at approximately 1:00 p.m. on May 12.

45.     According to Turn Key policy, Kyle should have undergone another medical intake screening once he returned to the Jail. In violation of policy, however, Kyle was not given another medical intake on May 12, 2021.

46.     Back at the Jail, Kyle was returned to segregation. Upon information and belief, however, he was not placed on suicide watch, despite his previous suicide attempts and reports that he would be suicidal back at the Jail.

47.     Upon information and belief, Kyle continued to pose an obvious and excessive risk of self-harm on May 12.

48.    Jail and Turn Key Staff, including the named-Defendants, failed to adequately monitor Kyle or provide him any kind of medical treatment on May 12 or the morning of May 13.

49.    Kyle was checked on at 8:00 a.m. on May 13 by Nurse Nuñez, who noted that she gave Kyle "meds." Nurse Nuñez did nothing else for Kyle, such as put him on suicide watch or refer him to a physician or outside medical provider, despite knowing of his prior suicide attempts and suicidal ideation.

50.    Kyle should have been on suicide watch and checked on at least every 15 minutes. However, upon information and belief, he was not checked on again until approximately 10:30 a.m. At that time, Kyle was found hanging in his cell.

51.    Norman Fire Department was called and they transported Kyle to Norman Regional, where he was declared brain dead. Kyle was kept on life support for two days so that his organs could be donated. He was ultimately taken off life support and died on May 15, 2021. He was just 37 years old.

52.    The Medical Examiner determined that Kyle's death was "ligature asphyxiation" due to hanging. The Medical Examiner ruled Kyle's death a suicide.

53.    The staff responsible for Kyle's wellbeing, including Defendants DOES ##1-5 and Turn Key staff, including Nurse Nuñez, were deliberately indifferent to the known or obvious risks of suicide/self-harm to Kyle by failing to take adequate measures to protect Kyle from the known or obvious risks of serious harm.

54.     In particular, staff responsible for Kyle's wellbeing, including Defendants DOES ##1-5 and Turn Key staff, including Nurse Nuñez, failed to, *inter alia*: refer Kyle for a mental health assessment, frequently visually monitor Kyle; place Kyle on suicide watch precautions, remove bed linens and garments from Kyle's cell; monitor Kyle through use of the intercom system; or call medical personnel to provide treatment to Kyle.

55.     The deliberate indifference to Kyle's health and safety, as described herein, was a proximate cause of his physical and mental pain and suffering, a worsening of his condition, and his death.

56.     The deliberate indifference to Kyle's serious medical needs, his mental health and his safety, as summarized *supra*, was in furtherance of and consistent with: (a) policies, customs, and/or practices which CCSO promulgated, created, implemented or possessed responsibility for the continued operation of; and (b) policies, customs, and/or practices which Turn Key promulgated, created, implemented or possessed responsibility for the continued operation of.

57.     There are longstanding, systemic deficiencies in the mental health care, including the failure to protect inmates from self-harm, provided to inmates at the Cleveland County Jail. The Sheriff and Turn Key have long known of these systemic deficiencies and the substantial risks they pose to inmates like Kyle but failed to take reasonable steps to alleviate those deficiencies and risks.

58.     For a time in recent years, Defendant Turn Key was the largest private medical care provider to county jails in the state.  Turn Key used its political

connections to obtain contracts in a number of counties, including Tulsa County, Cleveland County, Oklahoma County, Muskogee County, Garfield County and Creek County.

59.     To achieve net profits, Turn Key implemented policies, procedures, customs, or practices to reduce the cost of providing medical and mental health care service in a manner that would maintain or increase its profit margin.

60.     There are no provisions in Turn Key's contract creating or establishing any mandatory minimum expenditure for the provision of Healthcare Services. Turn Key's contract incentivizes cost-cutting measures in the delivery of medical and mental health care service at the Jail to benefit Turn Key's investors in a manner that deprives inmates at the Jail from receiving adequate medical care.

61.     Under the Contract, Turn Key is responsible to pay the costs of all pharmaceuticals at the Jail.  And CCSO/Cleveland County is responsible for the costs of all inmate hospitalizations and off-site medical care.  These contractual provisions create a dual financial incentive to under-prescribe and under-administer medications and to keep inmates, even inmates with serious medical needs, at the Jail to avoid off-site medical costs.

62.     These financial incentives create risks to the health and safety of inmates like Kyle who have complex and serious medical needs, such as opioid withdrawal, seizure disorders, mental health issues, and heart disease.

63.     Turn Key has no protocol or clear policy with respect to the medical monitoring and care of inmates with complex or serious medical needs, and provides

no guidance to its medical staff regarding the appropriate standards of care with respect to inmates with complex or serious mental health needs, including suicidal inmates.

64.     Specifically, Turn Key has an established practice of failing to adequately assess and treat -- and ignoring and disregarding -- obvious or known symptoms of emergent and life-threatening conditions.

65.     These failures stem from the chronic unavailability of an on-site physician or psychiatrist, financial incentives to avoid the costs of inmate prescription medications and off-site treatment, staffing county Jails with only unsupervised LPNs who are not licensed to diagnose or treat serious medical conditions, and a failure to train and supervise medical staff in the assessment and care of inmates with complex or serious mental health needs, including suicidal inmates.

66.     Dr. Lewis, Turn Key's psychiatrist, was a "roving" provider, who worked a numerous facilitates.  Thus, as a matter of policy and practice, Dr. Lewis was unavailable most of the time to inmates like Kyle with serious psychosis in urgent and emergent need of an assessment. This lack of availability of psychiatrist care constitutes unconstitutional understaffing and inadequate supervision.

67.     Turn Key's inadequate or non-existent policies and customs were a moving force behind the constitutional violations and injuries alleged herein.

68.     Indeed, Kyle was not assessed or treated by any medical provider with more training than an LPN during his week at the Jail. He was never seen by an

RN, a physician, or a nurse practitioner, despite his repeated suicide attempts and obviously serious mental health needs.

69.    Turn Key has maintained a custom of inadequate medical care and staffing at a corporate level which poses excessive risks to the health and safety of inmates like Kyle.

70.    In addition, CCSO has utterly failed to train its detention staff in how to properly care for or supervise inmates, like Kyle, with complex or serious mental health needs, or who otherwise pose a substantial risk of self-harm, with deliberate indifference to the health and safety of those inmates.

71.    In deliberate indifference to Kyle's obvious mental health needs, Defendants DOES ##1-5 failed to adequately check on Kyle while he was in segregation.

72.    The violation of Kyle's Constitutional rights was a highly predictable consequence of CCSO and/or Turn Key's failure to train and/or supervise staff with respect to the care, assessment, monitoring and precautions necessary to address the recurring situation of inmates who pose a substantial risk of self-harm or harm from other inmates.

73.    This specific failure to train and/or supervise staff was a proximate cause of -- or moving force behind -- the violation of Kyle's Constitutional rights.

74.    In January 2018, Marconia Kessee died while in custody at the Jail.

75.    Mr. Kessee was arrested just after 7:00 p.m. on January 16, 2018 by Norman Police Department ("NPD") officers.

14

76.     During the arrest, it was obvious to the officers that Mr. Kessee was overdosing on drugs, physically ill, and mentally unstable. Mr. Kessee could not walk on his own, was unable to put on his glasses, could not effectively communicate with the officers, and obviously needed medical assistance.

77.     The officers, however, transported Mr. Kessee to the Cleveland County Jail.

78.     At the Jail, it was clear that Mr. Kessee required immediate medical attention. He was convulsing, had glassy eyes, was sweating, was short of breath, and could not walk or stand on his own. The Jail should not have even cleared him for booking.

79.     CCSO and Turn Key personnel, composed solely of LPNs, chose not to even do a medical intake on Mr. Kessee despite his obviously serious medical conditions, and instead placed him in a holding cell.

80.     CCSO and Turn Key employees allegedly removed Mr. Kessee's clothing and placed him in a "suicide blanket."

81.     CCSO and Turn Key personnel never medically assessed Mr. Kessee and denied him access to a physician at the Jail.

82.     Additionally, CCSO jailers failed to adequately check on Mr. Kessee every 15 minutes while he was in the holding cell.

83.     At approximately 9:00 p.m. on January 16, 2018, a CCSO jailer "checked" on Mr. Kessee. In reality, the jailer simply observed that Mr. Kessee was lying face down in the cell in the same position as they had left him approximately

one hour before. The jailer did not check to see if Mr. Kessee was moving, breathing, or alive.

84.     At approximately 9:53 p.m., a CCSO jailer checked on Mr. Kessee, who appeared lifeless in the cell. When jailers entered the cell, they discovered Mr. Kessee was not breathing. He was transported to Norman Regional, where he was pronounced dead.

85.     CCSO and Turn Key personnel were deliberately indifferent in failing to provide competent medical treatment to Mr. Kessee, who was obviously suffering from a serious medical condition, and failing to adequately check on him while he was in segregation.

86.     In November 2020, another man, Terrance Lavon Osborne, died at CCSO while under the "care" of the County/CCSO/the Sheriff and Turn Key.

87.     Mr. Osborne was on several prescription medications for his medical conditions, including heart disease. The Jail and Turn Key knew of Mr. Osborne's conditions and his prescribed medications.

88.     In deliberate indifference to Mr. Osborne's serious health conditions, Jail and Turn Key staff failed to properly administer Mr. Osborne's medications to him. Additionally, as Mr. Osborne's symptoms, including increased weeping fluid from his legs, swelling, skin sloughing off his feet, infection in his legs and feet, and chest pain, worsened, he was never seen by a physician or transported to an outside medical provider.

89.     Indeed, Mr. Osborne was only assessed by unsupervised LPNs, just like Kyle.

90.     CCSO's understaffing of medical personnel at the Jail was admitted in 2023 when the Cleveland County Board of County Commissioners approved an additional $500,000/year in medical funding for the Jail after the deaths of three additional inmates at the Jail, including one who died by suicide.

91.     All three inmates, two of whom died in late 2022 and one who died in February 2023, suffered from serious mental health conditions, like Kyle.

92.     Cleveland County Commissioner Rod Cleveland stated the move was in response to the growing Jail population, which was, on average, approximately 66% higher in 2022 compared to 2019. This was a tacit admission that the Jail was severely understaffed compared to the number of inmates who needed care.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Cruel and Unusual Punishment in Violation of the Eighth and/or Fourteenth Amendments to the Constitution of the United States**
**(42 U.S.C. § 1983)**

### A.  Underlying Constitutional Violations / Individual Liability

93.     Plaintiff re-alleges and incorporate by reference paragraphs 1 to 92, as though fully set forth herein.

94.     CCSO and Turn Key staff, including Defendants DOES ##1-5 and Nurse Nuñez, knew, or it was obvious, that Kyle was at significant risk of serious injury and harm, including death, as set forth herein.

95.     CCSO and Turn Key staff, including Defendants DOES ##1-5 and Nurse Nuñez failed to provide Kyle with, or assure that Kyle was provided with, adequate medical care, mental health care, supervision and protection while he was housed at the Jail.

96.     CCSO and Turn Key staff, including Defendants DOES ##1-5 and Nurse Nuñez's acts and/or omission as alleged herein, including but not limited to their failure to provide Kyle with, or assure that Kyle was provided with, adequate safety precautions and supervision protection, medical and mental health supervision, assessment and treatment, constitute deliberate indifference to Kyle's serious health and safety needs.

97.     As a direct and proximate result of CCSO and Turn Key staff, including Defendants DOES ##1-5 and Nurse Nuñez's deliberate indifference, Kyle experienced physical pain, severe emotional distress, mental anguish, death and the damages alleged herein.

**B.     Municipal/*Monell* Liability (Turn Key and the Sheriff)**

98.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 97 as though fully set forth herein.

99.     Turn Key and the Sheriff are "persons" for purposes of 42 U.S.C. § 1983.

100.   At all times pertinent hereto, Turn Key and the Sheriff were acting under color of state law.

101.   Turn Key was endowed by the Sheriff/County with powers or functions governmental in nature, such that Turn Key became an instrumentality of the state and subject to its Constitutional limitations.

102.   Turn Key and the Sheriff/County were charged with implementing, maintaining and assisting in developing the policies and custom in place at the Jail, with respect to the safekeeping, protection, supervision and medical and mental health care of the residents at the Jail, including Kyle, and have a shared responsibility to adequately train and supervise their employees and agents/CCSO staff.

103.   There is an affirmative causal link between the aforementioned deliberate indifference to Kyle's serious medical and mental health needs, his safety, and his civil rights; and the following customs, policies, and/or practices which MCCOYS and the County carried, maintained or otherwise possessed responsibility for.

104.   The unconstitutional policies, practices, and/or customs are described fully in paragraphs 56-75, *supra*.

### SECOND CLAIM FOR RELIEF

### Negligence
### (Defendants Shelby and Red Rock)

105.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 104 as though fully set forth herein.

106.    Defendants Red Rock and Shelby owed a duty to Kyle, and all other patients at Red Rock, to use reasonable care to provide reasonable protection from harm, safety precautions, supervision, and necessary medical and mental health care.

107.    Red Rock and Shelby breached that duty by failing to provide Kyle with prompt and adequate medical and mental health care despite Kyle's obvious needs.

108.    Shelby's assessment of Kyle fell below established standards of care. Despite Kyle's suicidal ideation, mental health history, previous suicide attempts, and detox status, Shelby determined that Kyle did not require inpatient treatment.

109.    As a direct and proximate result of these Defendants' negligence, Kyle experienced physical pain, severe emotional distress, mental anguish, death and the damages alleged herein.

110.    Red Rock is vicariously liable for the negligence of its employees and agents.

## THIRD CLAIM FOR RELIEF

### Excessive Use of Force
### Fourth/Fourteenth Amendments, 42 U.S.C. § 1983
### (DOES ##1-5 and Sheriff)

111.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 110, as though fully set forth herein.

112.    At the time of the complained of events, Kyle, as pretrial detainee, had a clearly established constitutional right under the Fourteenth and/or Fourth Amendment to be secure in his person and free from objectively unreasonable seizure through excessive force to injure him and his bodily integrity.

113.    Any reasonable officer knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

114.    In the totality of the circumstances, at the time that DOES ##1-5 "tazed" and placed Kyle in the Wrap device for several hours, Kyle was: 1) unarmed; 2) obviously suffering from mental illness and suicidal ideation; 3) not fleeing; and 4) posed no threat to the officers, or anyone else.

115.    The uses of violent force by DOES ##1-5 under the circumstances described herein were excessive and objectively unreasonable.

116.    DOES ##1-5 applied objectively unreasonable and excessive physical force on Kyle, thereby causing him serious bodily injures, as well as mental pain and anguish.

117.    As a direct proximate result of DOES ##-15's unlawful conduct, Plaintiff is entitled to damages for Kyle's actual physical injuries, mental and physical pain and suffering and other damages and losses as described herein entitling him to recover compensatory and special damages in amounts to be determined at trial.

118.    There is an affirmative link between the aforementioned excessive force utilized by CCSO/Jail officers on Kyle and policies, practices and/or customs

which Defendant Sheriff promulgated, created, implemented and/or possessed responsibility for.

119.   Such policies, practices, and/or customs include, but are not limited to:

    a.   Using restraint devices as punishment or to gain compliance;

    b.   Using violent force against individuals who are fully mechanically restrained and pose no threat of harm to anyone;

    c.   Understaffing - especially in light of the fact that the Jail was consistently overcrowded;

    d.   Nonexistent or inadequate training of Jail employees, especially in the areas of de-escalation, proper uses of force, especially on inmates obviously suffering from mental illness and/or suicidal ideation, and training pertaining to the Wrap and restraint chair;

    e.   Nonexistent or inadequate supervision of Jail employees, including, but not limited to:

        i.   A custom of failing to report employee policy violations;

        ii.   A custom of failing to discipline employees who commit policy violations; and

        iii.   A culture of tacitly endorsing instances of excessive force committed against inmates.

120.   By the time that DOES ##1-5 assaulted Kyle, described, *supra*, there was an established and unabated custom of excessive use of force by CCSO detention officers.  These prior instances of excessive force put the Sheriff on notice that the detention officers were inadequately trained and/or supervised with respect to the use of force.  The Sheriff knew that there were serious deficiencies with the training and/or supervisions of detention offices that created excessive risks, but he

failed to alleviate those risks.

121.   The Sheriff knowingly failed to enforce policies necessary to the safety of citizens like Kyle in deliberate indifference to their constitutional rights.

122.   The Sheriff knew and/or it was obvious that the maintenance of the aforementioned policies, practices and/or customs posed an excessive risk to the health and safety of inmates like Kyle.

123.   The Sheriff disregarded the known and/or obvious risks to the health and safety of inmates like Kyle.

124.   The Sheriff is liable, in his official capacity, for these unconstitutional policies and customs.

125.   There is an affirmative link between the unconstitutional acts of his subordinates and the Sheriff's adoption and/or maintenance of the aforementioned policies, practices and/or customs.

126.   As a direct and proximate result of the aforementioned policies, practices and/or customs, Kyle suffered the injuries and damages as alleged herein.

**<u>PRAYER FOR RELIEF</u>**

127.   WHEREFORE, based on the foregoing, Plaintiff prays that this Court grant him the relief sought including, but not limited to, actual damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from date of filing of suit, punitive damages (for the reckless disregard of Kyle's rights as described above) in excess of Seventy-Five Thousand Dollars ($75,000.00), reasonable attorney's fees, and all other relief deemed appropriate by this Court.

Respectfully submitted,

/s/Daniel E. Smolen
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Smolen & Roytman
701 S. Cincinnati Ave.
Tulsa, Oklahoma 74119
P: (918) 585-2667
F: (918) 585-2669